NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

JACKLYN D., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, C.D., K.D., F.D., B.D., N.D.,
*Appellees*.

No. 1 CA-JV 18-0156
FILED 12-18-2018

Appeal from the Superior Court in La Paz County
No.  S1500JD201400009
The Honorable Samuel E. Vederman, Judge (Retired)

**AFFIRMED**

COUNSEL

Rideout Law, P.L.L.C., Lake Havasu City
By Bradlee H. Rideout, Wendy Marcus
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Amanda Adams
*Counsel for Appellee Department of Child Safety*

―――――――――――――――――

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge James P. Beene and Judge Michael J. Brown joined.

―――――――――――――――――

**M O R S E**, Judge:

¶1        Jacklyn D. ("Mother") appeals the juvenile court's order of termination of her parental rights to her five minor children ("Children"). Because the record supports the juvenile court's findings in favor of termination, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        In August 2014, the Children were living with Mother, Mother's father ("Grandfather"), and the father of four of the Children ("Father"). All were living on Grandfather's property. The oldest child was nine years old at that time. On August 27, 2014, workers with the Department of Child Safety ("DCS"), responded to a report of suspected neglect and visited the family. Mother and Father were suspected of using methamphetamine, but both denied allegations of substance abuse. The DCS workers found that two children lived with their parents in one travel trailer, and the remaining three lived in a separate mobile home. The DCS workers observed that the Children were living in unsanitary and unsafe conditions and removed them. The Children were placed with different foster care providers, and subsequently declared to be dependent.

¶3        DCS referred Mother to a variety of services, including a parenting class, individual counseling, drug testing, and a domestic violence class. Most of her referrals were done through Community Health Associates ("CHA"), and she was also referred to transportation for all services.

¶4        Mother began to attend parenting classes through CHA, but those classes stopped in May 2015, because she did not participate: Mother was inconsistent in her attendance, often did not complete homework, and fought and argued with Father during the classes. Mother also initially attended counseling through CHA, but stopped in April 2015. However, Mother completed the domestic violence class.

**¶5** Mother was referred to Treatment Assessment Screening Center ("TASC") and CHA for substance abuse treatment and drug testing. Mother routinely failed to submit to drug tests, and when she did, her tests were often positive for methamphetamine. In March 2015, Mother began an inpatient drug treatment program, but left after only four days.

**¶6** Dr. Leonard Sarff, a clinical psychologist, completed a psychological assessment of Mother on April 2, 2015. Based on Mother's past lack of follow-through, he opined with a "guarded" prognosis that Mother would be able to demonstrate minimal parenting skills in the near future. He noted that Mother resisted going to therapy, and that she "needs to participate in therapy," including cognitive behavioral therapy.

**¶7** From August 2015 to January 2016, Mother's drug tests were consistently negative, with only one invalid test. As a result, DCS referred her for additional parent-aide services, and beginning December 2015, DCS began to place the Children with Grandfather.

**¶8** By February 1, 2016, all of the Children were living with Grandfather. Around the same time, Mother submitted an invalid drug test and started refusing drug tests. She also stopped engaging with DCS, which caused DCS to suspend her parent-aide referral and inform her she could not reside with the Children in Grandfather's home until DCS could verify that she was sober. In June 2016, the conditions at Grandfather's house had become unsafe and unsanitary, and DCS removed the Children and again placed them in foster care. DCS subsequently requested that the case plan be changed from reunification to severance and adoption, which the juvenile court approved. DCS filed its motion for termination on October 10, 2016. The termination hearing took place on five trial days beginning May 2017, and ending February 2018.

**¶9** In 2016 and 2017, Mother continued to struggle with the case plan. She routinely disengaged from services, frequently missed drug tests, occasionally tested positive for methamphetamine, missed and cancelled counseling appointments, and failed to complete DCS-referred parenting classes. Despite the availability of transportation to visit the Children, her visitation was sporadic. Mother again entered an inpatient drug-treatment program that was supposed to last for a few months, but she left after a few days. In December 2017, a DCS worker described Mother's overall compliance as "minimal."

**¶10** On July 17, 2017, Dr. Sarff performed another assessment and opined that Mother's prognosis of being able to minimally parent the

Children in the foreseeable future improved from "guarded" to "fair." However, when Dr. Sarff learned that Mother had misled him about key aspects of her life (*e.g.*, Mother falsely told Dr. Sarff that she had been participating in counseling), he changed the prognosis back to "guarded," or even "impaired."

¶11 In the final months before the juvenile court ruled on DCS's motion for termination, Mother demonstrated some improvement. Mother had two mostly-positive visits with the Children, although the two older children didn't listen to her and the supervising DCS caseworker, who was new to the case, had to step in and help. Mother also began attending counseling and substance abuse classes. However, she still missed most drug tests and tested positive for methamphetamine as late as February 2018.

¶12 At the end of the termination hearing, the Children were all living in adoptive placements.

¶13 On April 20, 2018, the juvenile court terminated the parental relationship between Mother and the Children based on the nine months' time-in-care ground and the fifteen months' time-in-care ground, and found that termination was in the best interests of the Children. Mother timely appealed, and we have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 8-235(A), 12-120.21(A)(1), and -2101(A)

## DISCUSSION

¶14 Mother argues that the juvenile court's order was not supported by sufficient evidence. Specifically, she argues that DCS did not prove: that Mother "substantially neglected or wilfully refused to remedy the situation that kept the Children in out-of-home care"; that there was a substantial likelihood that she would "not be capable of exercising proper and effective parental care and control in the near future"; or that severance was in the Children's best interests. A.R.S. § 8-533(B)(8). Because we hold that the record supported termination on the fifteen months' time-in-care ground, we need not consider the remaining ground. *Seth M. v. Arienne M.*, 245 Ariz. 245, 259, ¶ 13 (App. 2018).

I. **Substantial Likelihood of Proper and Effective Parental Care and Control in the Near Future**

¶15 We will uphold the juvenile court's finding of a ground for termination "unless we must say as a matter of law that no one could

reasonably find the evidence to be clear and convincing." *Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 94, ¶ 7 (App. 2009). To terminate on the fifteen months' time-in-care ground, DCS had to prove by clear and convincing evidence that the Children had been in an out-of-home placement for at least fifteen months, Mother had not remedied the circumstances which caused the out-of-home placement, and there was a substantial likelihood that she would "not be capable of exercising proper and effective parental care and control in the near future." A.R.S. § 8-533(B)(8). Mother only contests the last element, arguing that with the proper help, she could be capable of exercising proper and effective parental care and control in the near future.

¶16　　　At termination, the Children had been in the out-of-home placement for three years, and Mother was not showing significant signs of improvement. Mother showed no signs of improvement with her drug abuse and continued to refuse drug tests. She tested positive for methamphetamine as late as February 2018. Although she had positive interactions with the Children, she remained unable to parent them without the help of the DCS supervisor. In the span of three-and-a-half years, Mother never consistently and fully engaged with her services for more than a couple of months.

¶17　　　In addition, the DCS case manager for Mother's case did not think Mother would be able to parent in the near future, and Dr. Sarff, who performed two psychological assessments of Mother, opined that the prognosis for Mother being able to effectively parent in the near future was "guarded" or "impaired."

¶18　　　Mother argued that she was likely to improve once she receives cognitive behavior therapy, pointing to Dr. Sarff's statement that if she had successfully completed such therapy, it would have alleviated some of the concerns he had about her. However, while it may be true that Dr. Sarff would have changed his prognosis based on Mother's completion of services, the record shows that she did not complete the vast majority of services offered to her. This lack of progress on Mother's part is evidence of her inability to parent in the near future. We only review to determine the sufficiency of the evidence, and will not reweigh evidence on appeal. *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009)

¶19　　　Based on the facts contained in the record, the juvenile court could reasonably conclude by clear and convincing evidence that there was a substantial likelihood that Mother would not be able to properly and effectively parent the Children in the near future.

## II.     Children's Best Interests

**¶20**          To meet the best-interests requirement, DCS had to prove that termination would either confer a benefit on the Children or remove a detriment from them. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 8 (App. 2016).

**¶21**          At the time of the hearing, the Children were in adoptive placements. The juvenile court found that the Children were adoptable and were doing well in foster care. The court also found that the Children's health and safety would be in jeopardy if they were returned to Mother.

**¶22**          Mother does not explain why she believes there was insufficient evidence to support the juvenile court's best-interests finding. Because the record contains sufficient evidence to support the findings, the juvenile court did not err in determining that termination was in the best interests of the Children.

## CONCLUSION

**¶23**          Because there was sufficient evidence to support a ground for termination and that termination was in the best interests of the Children, we affirm the juvenile court's order terminating Mother's parental relationship with the Children.



AMY M. WOOD • Clerk of the Court
FILED:   AA